## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 29 2018, 9:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jacob P. Wahl
Jasper, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re:  The Mental Health Commitment of: P.S., <br><br> *Appellant-Respondent,* <br><br> v. <br><br> Good Samaritan Center, LCSW <br><br> *Appellee-Petitioner* | March 29, 2018 <br><br> Court of Appeals Case No. 51A01-1709-MH-2043 <br><br> Appeal from the Martin Circuit Court <br><br> The Honorable Lynne E. Ellis, Judge <br><br> Trial Court Cause No. 51C01-1706-MH-2 |

**Altice, Judge.**

## Case Summary

[1] P.S. challenges the sufficiency of the evidence supporting her involuntary civil commitment. In granting the regular commitment,[1] the trial court determined that P.S. was mentally ill and dangerous to herself and others. On appeal, P.S. does not challenge the finding of mental illness, but she contends that her dangerousness was not proven by clear and convincing evidence.

[2] We affirm.

## Facts & Procedural History

[3] P.S. has been diagnosed with schizophrenia and has received psychiatric care from Dr. Michael Cantwell, the medical director of the LaSalle Behavioral Health Unit at Good Samaritan Hospital (LaSalle Behavioral Health). Over the years, Dr. Cantwell has met with P.S. on "[i]nnumerable" occasions. *Transcript* at 4.

[4] During the early morning hours of June 10, 2017, P.S. called a crisis hotline and indicated that she had not been taking her prescribed medication and was having suicidal ideations. During the call, P.S. exhibited "incongruent speech and mood – disorganized speech." *Appendix* at 8. P.S. was directed to seek immediate assistance at the nearest emergency room. Accordingly, P.S. went

---

[1] There are four types of involuntary civil commitment in Indiana. *See Civil Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 n.1 (Ind. 2015) (describing each type). Regular commitment, the type addressed in this case, is for an indefinite period of time that may exceed ninety days. *Id.* (citing Ind. Code § 12-26-7 *et seq.*).

to Good Samaritan Hospital and was admitted later that day to LaSalle Behavioral Health, pursuant to an emergency detention.

[5] Dr. Cantwell performed P.S.'s initial evaluation upon admission. He noted that P.S. was psychotic and appeared to be under the influence of amphetamines. P.S. exhibited disorganized thinking and was responding to visual and auditory hallucinations. Based upon his previous treatment of P.S., Dr. Cantwell observed that P.S.'s thinking appeared more impaired than usual.

[6] On the morning of June 12, 2017, P.S. became angry with a nurse and confronted her at the nurse's station. P.S. was directed back to her room due to her yelling obscenities, but P.S. turned around and attempted to strike the nurse. The nurse and another employee then tried to get P.S. into her room, while P.S. continued to fight. P.S. threw her elbow into the nurse's stomach before security arrived and returned P.S. to her room. P.S. was yelling and threatened to kill the nurse.

[7] Shortly thereafter, P.S. began repeatedly smashing a trash can against the door from inside her room. She was yelling and cursing and refused requests to calm down. Staff members entered the room and physically restrained her, as she attempted to strike them. P.S. spat in the face of her nurse and threatened to kill her. P.S. was placed in four-point restraints. Despite this, P.S. refused to calm down and continued threatening the nurse's life. Minutes later, P.S. slipped off her wrist restraints and staff once again had to subdue her as she fought them and made threats. The wrist restraints were reapplied, along with

upper arm restraints. Later that evening, P.S. intentionally urinated all over herself and the bed and then demanded to have the restraints removed so the bed sheets could be changed. P.S. became angry upon learning that the sheets would be changed without removing the restraints.

[8] The following morning, Dr. Cantwell spoke with P.S. and she, once again, became upset. She attempted to kick him in the stomach but was unable to make contact due to the doctor's clipboard blocking her. Thereafter, P.S. refused to take her scheduled morning medications.

[9] That same day, June 13, 2017, LaSalle Behavioral Health filed a petition for the involuntary commitment of P.S. based upon her psychiatric disorder and a belief that she was dangerous as a result of her schizophrenia. Dr. Cantwell's physician's statement was filed with the petition. Dr. Cantwell opined that P.S. needed inpatient treatment at Evansville State Hospital for a period of more than ninety days.

[10] The trial court held a commitment hearing on June 15, 2017, at LaSalle Behavioral Health. Dr. Cantwell was the sole testifying witness. Dr. Cantwell testified that P.S. suffers from schizophrenia and, at the current time, was dangerous and still on room restrictions. Dr. Cantwell opined that P.S. needed structured inpatient treatment with medication and supervision to "make sure she doesn't get aggressive with others and end up being hurt herself or hurting other people" and to prevent her from "using illicit drugs until she understands that they're bad for her mental health." *Transcript* at 10. Dr. Cantwell

indicated that P.S. was currently prescribed Valium and Invega, an anti-psychotic mood stabilizing medicine.

[11] Additionally, Dr. Cantwell testified about P.S.'s past treatment and indicated, "we had tremendous difficulty maintaining her" and "she seemed to basically just challenge us to revoke her [during her past commitment]". *Id.* at 13. Given her "level of aggression and dissatisfaction with…treatment recommendations", Dr. Cantwell opined that it would be most appropriate to commit P.S. to Evansville State Hospital rather than continue her at LaSalle Behavioral Health. *Id.* at 14. Based upon his clinical experience, Dr. Cantwell believed that a commitment longer than ninety days – a regular commitment – would be required.

[12] At the conclusion of the hearing, the trial court determined that it was in P.S.'s best interests, as well as the community's, to grant the request for a regular commitment – inpatient to exceed ninety days. The court also found that said commitment should be at a state operated facility, such as Evansville State Hospital, "so that [P.S.] can be convinced in her mind that those sitting in this room are not here to harm her, but to help her to the best of everyone's ability." *Id.* at 19. The court issued an order of commitment that same day in which it expressly found that P.S. was suffering from a psychiatric disorder and was dangerous to herself and others.

## Discussion & Decision

[13]    To obtain an involuntary commitment of an individual, a "petitioner is required to prove by clear and convincing evidence that: (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." I.C. § 12-26-2-5(e). Here, the trial court found that P.S. was mentally ill and dangerous. P.S. does not challenge the mentally ill finding but asserts, on appeal, that there was insufficient evidence presented to establish that she was dangerous.

[14]    On review, we consider only the probative evidence and the reasonable inferences supporting the judgment without weighing evidence or assessing witness credibility. *T.K.*, 27 N.E.3d at 273. We will affirm an involuntary commitment if a reasonable trier of fact could find the challenged element(s) proven by clear and convincing evidence. *Id.*

[15]    The issue presented in this case is whether, considering the probative evidence and reasonable inferences favorable to the judgment, the trial court could have found by clear and convincing evidence that P.S. was dangerous. "'Dangerous' is 'a condition in which an individual as a result of mental illness, presents a substantial risk that the individual will harm the individual or others.'" *Id.* at 274 (quoting I.C. § 12-7-2-53).

[16]    The record establishes by clear and convincing evidence that P.S. was dangerous to herself and/or others due to her mental illness. P.S. has schizophrenia and had previously been under a commitment proceeding and treated by Dr. Cantwell. Her recent admission to LaSalle Behavioral Health

came after she called a crisis hotline and reported suicidal ideations. P.S. acknowledged that she had not been taking her medication. P.S. then went to the emergency room as directed. She was psychotic and presented with disorganized thinking and experiencing visual and auditory hallucinations.

[17] During her emergency commitment to LaSalle Behavioral Health, P.S. became aggressive and assaultive toward medical staff. She made multiple homicidal threats and attempted to assault staff several different times. She actually elbowed a nurse in the stomach on one occasion and spat in a nurse's face on another. Additionally, P.S. yelled and cursed, was destructive to property, and refused to calm down. As a result of her behavior, P.S. was placed on room restrictions and then four-point restraints. P.S. also refused to take her medication and did not believe she needed treatment.

[18] LaSalle Behavioral Health could not effectively manage P.S. due to her high level of aggression. Dr. Cantwell believed a state facility, like Evansville State Hospital, would be better able to deal with her aggression and help her become more mentally stable. Accordingly, upon finding that P.S. suffers from mental illness and is dangerous, the trial court determined that a regular commitment to a state operated facility was appropriate and the least restrictive environment suitable for P.S.'s care, treatment, and protection, as well as for the protection of others. Ample evidence supported the trial court's judgment.

[19] Judgment affirmed.

[20] Najam, J. and Robb, J., concur.